**Seymour PIELET, Irving Pielet, and Samuel Pielet, Plaintiffs-Counter-defendants-Appellees,**

v.

**Arthur PIELET, James Pielet, and Robert Pielet, Individually and as Trustees of the Pielet Bros. Employees' Profit-Sharing Plan and Joliet Railway Employees' Profit-Sharing Plan, and Pielet Bros. Scrap Iron & Metal, Inc., and Joliet Railway Equipment Co., Defendants-Counterplaintiffs-Appellants.**

**No. 81–2117.**

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1982.

Decided Aug. 12, 1982.

Rehearing Denied Sept. 9, 1982.

Certiorari Denied Jan. 10, 1983. See 103 S.Ct. 733.

Russell J. Topper, Chicago, Ill., for defendants-counterplaintiffs-appellants.

Edward L. Foote, Winston & Strawn, Chicago, Ill., for plaintiffs-counterdefendants-appellees.

Before ESCHBACH, Circuit Judge, NICHOLS,* Associate Judge, and POSNER, Circuit Judge.

NICHOLS, Associate Judge.

This case comes before the court on appeal from a judgment against appellants entered by the Honorable Bernard M. Decker, United States District Court for the Northern District of Illinois, Eastern Division, on June 11, 1981.

In 1975, defendant, Arthur Pielet, bought all of the common stock of the family scrap metal business from his brothers, Seymour, Samuel, and Irving. Previously, all four brothers had owned the business in equal shares. The business had grown in a few years from small beginnings, and became highly successful. Plaintiffs-appellees sold their interests in the business to Arthur, receiving as consideration $10 million in cash and some $600,000 in used equipment. In addition, plaintiffs were to remain on the payroll of Pielet Bros. Scrap and of Joliet Railway Equipment Co., another family business, as part-time consultants through January 1, 1977, receiving, in addition to

---

* The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, is sitting by designation.

their salaries, the right to their interests in the companies' profit-sharing plans. One year later, Arthur claimed that his brothers, by virtue of various actions they had taken, forfeited all rights in the corporate profit-sharing funds.

The case was first brought in an Illinois State Court as an action where plaintiffs-appellees sought declaratory relief regarding their rights under the above-mentioned profit-sharing plans. On defendants' motion, the case was removed to the U. S. district court where defendants counterclaimed for damages and injunctive relief alleging violations of certain noncompetition agreements and acts of unfair competition. The noncompetition agreements were actually provisions of the employment contracts entered into as part of the 1975 buyout.

Prior to trial, plaintiffs moved for partial summary judgment, seeking a declaratory judgment that they were permitted to deal in scrap in Chicago and that the forfeiture of their interest in the Pielet Bros. profit-sharing plan was illegal. Although plaintiffs-appellees' interests in both the Pielet Bros. Employees' Profit-Sharing Plan and the Joliet Railway Equipment Company Employees' Profit-Sharing Plan are the subject of this appeal, the latter plan, *i.e.*, the Joliet Railway Plan, was not in issue on plaintiffs' motion for partial summary judgment.

On February 3, 1978, the district court filed a memorandum opinion and order denying plaintiffs' motion for partial summary judgment on both the scrap-dealing and the forfeiture issues. In its opinion, the court concluded that section 7 of each of the employment agreements was meant to, and did in fact, govern the amount of competition that was to be permitted between the parties notwithstanding the existence of a noncompete provision in the Pielet Bros. profit-sharing plan.

Section 7 of the employment agreements provided:

Both parties recognize that the services to be rendered under this Agreement and the knowledge now possessed and to be acquired hereunder by Employee are special, unique, and of extraordinary charac-

ter. [Employee] shall not, for a period of five years subsequent to the date of this Agreement, directly or indirectly, alone, or as a member of a partnership or as an officer, director, stockholder or investor of or in any other corporation or enterprise (except as an investor in a publicly held corporation listed on a national securities exchange), or otherwise, own, operate or participate in the ownership or operation of a scrap yard or shredder within Chicago, Illinois or 100 miles of the city limits of Chicago, Illinois, excluding the cities of Milwaukee, Wisconsin and Sterling, Illinois. During such period, Employee shall not communicate or divulge to any person, firm or corporation, either directly or indirectly, any business affairs of Employer, any experience gained by him in the Employer's employ, the names of any of Employer's customers, or any other information not generally available to the public relating to Employer's business affairs or products.

The pertinent provisions of the Pielet Bros. profit-sharing plan relating to noncompetition were as follows:

8.01 Any participant who becomes a Terminated Employee shall be entitled to receive the entire amount of his account attributable to his Employee Contributions, and, unless he has been discharged for "cause," as hereinafter defined, he shall be entitled to receive that portion (sometimes referred to herein as the "vested interest") of the amount of his account attributable to Employer Contributions as is shown by the following table:

| If the Number of his Full Consecutive Plan Years of Participation Is: | The Portion of the Amount of his Account Balance Shall Be: |
| --- | --- |
| 1 | 10% |
| 2 | 20% |
| 3 | 30% |
| 4 | 40% |
| 5 | 50% |
| 6 | 60% |
| 7 | 70% |
| 8 | 80% |
| 9 | 90% |
| 10 or more | 100% |

* * * * *

8.02 Discharge for "cause" shall mean discharge for * * * actively engaging in or working for a business in direct competition with an Employer while employed by an Employer. * * *

The equivalent provisions of the Joliet Railway Plan were:

8.01 Any Participant who becomes a Terminated Employee shall be entitled to receive the entire amount of his Account Balance attributable to his Employee Contributions, and, unless he commits or has committed a "prohibited act" (as hereinafter defined), he shall be entitled to receive that portion (sometimes referred to herein as the "vested interest") of his Account Balance attributable to Employer Contributions as is shown by the following table:

| If the Number of his Full Consecutive Plan Years of Participation Is: | The Portion of the Amount of his Account Balance Shall Be: |
| --- | --- |
| 1 | 10% |
| 2 | 20% |
| 3 | 30% |
| 4 | 40% |
| 5 | 50% |
| 6 | 60% |
| 7 | 70% |
| 8 | 80% |
| 9 | 90% |
| 10 or more | 100% |

* * * * *

10.04 For purposes of the Plan, a "prohibited act" shall mean any of the following: * * * (d) engaging in activity, while in the employ of an Employer, which competes with any activity of an Employer; * * *

The district court also concluded that section 7 was ambiguous and to clarify the ambiguity, it would be necessary to resolve disputed facts, which could not be done on a motion for summary judgment. This conclusion made trial necessary.

Subsequent to the denial of partial summary judgment, the case proceeded to trial on plaintiffs' claim for profit-sharing plan benefits and defendants' claims for breach of contract and unfair competition, before a jury on April 20, 1981. At the trial, there was a good deal of evidence about the actual negotiation of Arthur's purchase and the related employment agreements. There is no need to state this evidence in detail. At the least of it, the jury could have found that Arthur fully understood that by section 7 his brothers would compete with a scrap yard or shredder outside 100 miles of Chicago and buy and sell within that limit. At the close of plaintiffs' evidence, defendants moved for a directed verdict, which motion was denied. Similarly, cross-motions for directed verdicts were denied at the close of all the evidence.

After extensive consultation with counsel for both sides, the district court submitted a single special interrogatory to the jury concerning the meaning of section 7 of the employment agreements. Both sides agreed to the procedure and upon the language of the special interrogatory which read:

In using the language "employee shall not own, operate, or participate in the ownership or operation of a scrap yard or shredder," in paragraph 7 of the employment agreements, did the parties intend to prohibit Seymour, Samuel, and Irving Pielet from buying and selling scrap metal within 100 miles of the City of Chicago?

The judge plainly thought that an answer to this one question furnished the key to the entire case. The jury answered the interrogatory "no" and the court entered judgment for the plaintiffs and against Arthur and the other defendants. The court directed the parties to attempt to agree on the value of plaintiffs' profit-sharing plan interests prior to its entry of judgment. The parties did so agree, and these agreements were incorporated into a final judgment order dated June 11, 1981. Defendants then filed a motion for a judgment notwithstanding the verdict which was denied on July 1, 1981. Defendants filed their notice of appeal with this court on July 10, 1981.

Appellants advance three main grounds for this appeal. First, they contend that the forfeiture of appellees' interest in the profit-sharing plans should be governed by the terms of the plans alone and not the

provisions of the subsequent employment agreements, specifically section 7 thereof. Secondly, they argue that the trial court erred in submitting the issue of the meaning of the words "scrap yard and shredder" to the jury when the meaning thereof was unambiguous and thus no question of fact remained for the jury to decide. Finally, appellants contend that the trial court erred in entering judgment on their counterclaim for unfair competition when neither the special interrogatory nor the jury's answer thereto bore any relation to the issues involved in the unfair competition claim.

Appellees oppose the arguments made by appellants contending that the lower court's entry of judgment should be affirmed. They also advance additional grounds why their pension plan interests should not be forfeited. Appellees argue that the forfeitures were invalid under the Employees Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq. Further, that under each of the profit-sharing plans, forfeitures are not automatic and the procedures for forfeiture, were not followed, hence the forfeitures were legally ineffective.

Because we affirm the lower court's disposition of this case, we express no opinion on the effect of ERISA on the forfeiture of pension plan interests, either as a general matter, or as regards the pension plan interests in this case. Such issues are mooted. Similarly, we do not reach the question of whether under the plans forfeitures are automatic or whether proper procedures were followed.

## I

■ Appellants assert that there is no evidence to support the trial court's conclusion that section 7 of the employment agreements governed the amount of competition allowed between the opposing parties under the profit-sharing plans in question. In fact, appellants contend that each plan provides its provisions alone shall govern the benefit rights of employee participants. Furthermore, plaintiffs' own attorney who drafted the employment agreements disowned an intention to amend the profit-sharing plans. Therefore, appellants argue, since plaintiffs have admitted to forms of competition that breach the controlling non-competition provisions of the profit-sharing plans, the lower court erred when it refused to grant their motions for a directed verdict and a judgment, notwithstanding the verdict in their favor. We disagree.

Initially, the profit-sharing plans were drafted in 1967, the employment agreements in 1975. Paragraph 5(a) of each of the 1975 employment agreements provides in pertinent part:

During the term of this Agreement, Employee shall be considered an employee *eligible to participate under Employer's profit sharing plan* and shall be entitled to any other regular fringe benefits provided for employees of Employer during such period. * * * [Emphasis supplied.]

The terms of the employment agreements explicitly contemplate that Seymour, Samuel, and Irving would continue to be eligible to participate in the profit-sharing plans. Appellees were at the time of the 1975 agreements, 80 percent and 75 percent vested in the Pielet and Joliet Railway plans, respectively. It appears to us that section 7 was specifically tailored to meet the needs of the two sides. Arthur, on the one hand, needed some protection against competition by his brothers because part of the 1975 buy-out was that they would get the shredder equipment. The appellees, on the other hand, did not want to abandon the scrap business entirely. They also wanted to retain their interests in the profit-sharing plans.

As touched on earlier in this opinion, Arthur had agreed to an option for the sale of $600,000 worth of shredder equipment and to a further agreement whereby the company established by his brothers, on one hand, and Pielet Bros., on the other, would loan spare parts to each other for a period of 10 years. As the trial court apparently recognized, the option and parts loan agreements and the right of Seymour, Samuel, and Irving to operate a shredder without losing

their eligibility for pension benefits, are rendered meaningless if the restriction on competition found in the profit-sharing plans is not modified or explained by section 7. Merely doing what the employment agreements permit, *i.e.*, owning or operating a "scrap yard or shredder" 100 miles outside Chicago city limits would thus allow a forfeiture of appellees' profit-sharing benefits, a result that was not intended by the parties. Indeed a written modification of the employment agreements was reached and signed by Arthur which provided that Seymour, Samuel, and Irving's original salaries were reduced, effective immediately, to a nominal consulting salary. Arthur admitted that he agreed to the modification so his brothers would not lose their profit-sharing benefits. (Tr. 510, 531–32, 536.)

On the face of the profit-sharing plans, they could be amended at any time. Arthur, as the sole shareholder and president of Pielet Bros., signed the 1975 employment agreements permitting his brothers to engage in certain activities, *i.e.*, owning and operating a "scrap yard and shredder" 100 miles outside of Chicago. Our review of the record convinces us that there is substantial evidence to support the trial court's conclusion that to the extent language in the 1975 agreements governing competition is different from the 1967 profit-sharing plans, the later in time and more specific document controls.

Appellants vigorously assert that the attorney who prepared the 1975 employment agreements testified that he did not intend by those agreements to amend the profit-sharing plans. Semantically, one may question if it is an amendment to make specific what was previously only general. While this evidence unexplained might show the intention of the parties, its probative force is weakened by the fact that it shows counsel's understanding, not that of the parties. Counsel was called into a family conclave at short notice and without full briefing. He had previously represented all the brothers. Arthur knew he was not representing Arthur alone at that meeting. Furthermore, this evidence is far from being the only evidence on the question of intent, and as

we have shown above, the lower court was well within its province to come to a conclusion contrary to that suggested by appellants. Even Arthur's testimony did not wholly support his litigation position. We are therefore not persuaded that the trial judge should be reversed on his determination that section 7 of the employment agreements governed the extent of competition allowed between the parties in this case.

## II

Appellants' next argument is that the issue of the meaning of the words "scrap yard and shredder," as used in section 7 involved no issue of fact and should not have been submitted to the jury by special interrogatory. Expanding on that argument, they contend that where the terms of a contract are plain and unambiguous, such that the intention of the parties can be ascertained therefrom, there is no room for further inquiry.

Aside from whether we would consider the words "scrap yard and shredder" were ambiguous or involved questions of fact, appellants' argument cannot stand. Appellants expressly consented to the submission of the special interrogatory to the jury and should not now be heard to complain of its submission.

It appears that the subject of the special interrogatory first arose at the close of all the evidence when cross-motions for directed verdicts by the parties were presented. During argument, the court asked counsel for defendants-appellants, Mr. Topper, about the submission of a single interrogatory concerning the "right to buy and sell" scrap metal. (Tr. 670–71.) The following exchange took place:

Mr. Topper: If it stood alone, the question with which we are—your Honor's question to me as to whether or not we went to the jury on that special interrogatory, would that be enough, and if they answered would the case be over—

The Court: That is right. If they found—

Mr. Topper: If they found that they could compete, that's the end of it.

\* \* \* \* \* \*

But I would love to go to the jury on that issue your Honor has mentioned, I would love to, and if my client consents to it I'll go to the jury on that issue and consent to that special interrogatory.

The Court: Well, if you go to the issue—if you go to the issue on that and stand or fall on that, why—

Mr. Topper: I would, I would.

[Tr. 672–73.]

On the court's proposal of the submission of a single interrogatory, the counsel for both parties initially balked; apparently because they were concerned about waiving certain legal issues in the case. These issues included, on plaintiffs-appellees' side, the question of whether there was a proper forfeiture and whether forfeiture was permissible under ERISA; and on defendants-appellants' side, whether section 7 of the employment agreements had amended, hence governed, the amount of competition permitted by the noncompetition provisions of the profit-sharing plans. These facts are clearly discernible from the following exchange among the court, Mr. Topper, and Mr. Foote, plaintiffs-appellees' counsel:

Mr. Topper: Would you reserve after the jury returns and if the jury's verdict is that it is not prohibited, would you reserve consideration as matters of law whether or not, number one, there had been either an intention to change or modify or amend, and, secondly, whether under law that provision of Section 7 did actually effect an amendment or change of the original—those are two very important things—

The Court: Well, I mean, the whole point is—

Mr. Topper: And as I told your Honor in court—

The Court: Well, the questions of law remain in this case whether I separate it or not—

Mr. Topper: I understand, I understand.

\* \* \* \* \* \*

Mr. Foote: Well, your Honor, I just have one question: Assuming that the jury comes in with this bifurcated approach to liability and damages, assuming that the jury comes in and finds, then, my way, let's assume that they do, would your Honor then be inclined to enter judgment? That's the point. I mean that would certainly be an attraction to me if that is the game plan, that's what I am really trying to inquire as to, inquiring as to what your Honor has in mind.

Mr. Topper: Well, this is what I was inquiring about.

\* \* \* \* \* \*

The Court: Well, let me say this, on the basis of the record as it stands I would stand on what, on the opinion that I have already issued, I mean, if there was a point of time some time ago where you wanted to tell me that you thought that I was wrong in reaching the conclusion that Section 7 governed—I still think Section 7 governs the employment—you can't just throw it out the window. So I guess the answer is that I would, so far as I am concerned, that would end the case—you are going to preserve your questions of law and if I am wrong on my construction, why, you have got that.

Mr. Topper: Well, fine. We have established it then. We certainly do. We have an understanding then.

The Court: So, I would enter it, yes.

Mr. Topper: You have got a real break now, Eddie [Edward Foote]. You can beat me openly, quickly and completely by just one little interrogatory.

[Tr. 730–32.]

A further discussion followed between counsel for both parties and the court in which language of the special interrogatory was agreed upon. (Tr. 742–46.)

Prior to closing arguments and instructions to the jury, the court again confirmed with counsel for both parties, at the request of defendants' counsel, that judgment would be entered based on the answer to the special interrogatory. The following discussion occurred:

Mr. Topper: Do we understand, or do I understand, if the Court please, that Mr. Foote has now agreed that the agreement that we have had, or had on Friday, shall be binding on both parties? The commitment that we made with the Court, the submission of that issue?

The Court: Well, I am not going to have you make a commitment unless he has a commitment with you, I mean, that's where it stands right now, right where it was on Friday.

Mr. Topper: I have said already—

The Court: I got a commitment, a commitment from counsel for you. You can't have it both ways. Either we have an agreement or we don't have one. Now, let's—

Mr. Foote: Are you addressing me, your Honor?

The Court: Yes.

Mr. Topper: Yes, he is.

The Court: I am.

Mr. Topper: For myself—I will answer, I have indicated to the Court that my answer is that we agree.

Mr. Foote: Well, your Honor, if the jury in response to this interrogatory answers it "No," meaning that they were not prohibited, do I understand then that that ends this entire case, other than your Honor entering judgment on the issues in the case?

The Court: That's what I said.

Mr. Foote: Let me talk to Mr. Wendrow.

(Whereupon Mr. Foote and Mr. Wendrow conferred.)

Mr. Foote: Very well, your Honor.

The Court: All right.

Mr. Foote: You have my agreement.

The Court: Well, I think that we have—I think that we have everything now agreed upon.

[Tr. 779–81.]

There can be no question on this record that defendants-appellants agreed to the submission of the special interrogatory, the entry of judgment based on the answer, and the language of the special interrogatory.

In order to appeal a special interrogatory submitted to the jury under Rule 49(a) of the Federal Rules of Civil Procedure, or a refusal to submit a proposed interrogatory, a party must make a specific objection to the proposed interrogatory or to the trial judge's refusal to submit prior to the retiring of the jury. *Central Progressive Bank v. Fireman's Fund Insurance Co.*, 658 F.2d 377, 381 (5th Cir. 1981); *Hyde v. Land-of-Sky Regional Council*, 572 F.2d 988, 991 (4th Cir. 1978). As we have shown above, the appellants did not object but agreed to the interrogatory they now seek to challenge. Appellants have waived any right to raise an objection to the instant special interrogatory on appeal.

### III

Appellants' final argument is that their claims for unfair competition were wholly separate from and unrelated to any of the issues resolved by the special interrogatory. Thus, they contend the district court erred, violating their constitutional right to a jury trial, in entering judgment for appellees on the unfair competition claim based on the jury's answer to the special interrogatory. Appellees respond that aside from expressly agreeing to the submission of the special interrogatory and the entry of judgment based on the jury answer thereto, defendants-appellants' counsel failed to demand a submission of the alleged issues of fact pertaining to the unfair competition counterclaim. This failure, appellees assert, is deemed, under Rule 49(a), a waiver of the right to a trial by jury. Rule 49(a) provides:

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the writ-

ten findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

In our view, appellants' argument falls within the provisions of Rule 49(a). As revealed in section II of this opinion, appellants agreed to the submission of the single special interrogatory. Nowhere in the record can we find, nor do appellants argue, that they objected to this procedure. Further, appellants did not even suggest to the trial court, prior to the time the special interrogatory was submitted, that issues of fact concerning their unfair competition counterclaim were not being addressed by the one interrogatory or that such issues should also be submitted by special interrogatory to the jury. The rule provides that on the submission of special interrogatories, if the trial court "omits any issue of fact raised by the pleadings or by the evidence" that each party waives the right to a jury trial of the omitted issue unless he demands its submission before the jury retires. Appellants' counterclaim for unfair competition and facts underlying same were obviously raised by the pleadings and by the evidence.

We think that this case is significantly similar in certain material respects to *Cote v. Estate of Butler*, 518 F.2d 157 (2d Cir. 1975). In *Cote*, the owner and the driver of a truck filed separate actions against the estate of a deceased motorist, alleging negligence of decedent; an automobile dealer, alleging negligence and breach of warranty; and an automobile manufacturer, alleging breach of warranty. In each action the estate cross-claimed against the dealer and the manufacturer alleging negligence and breach of warranty. These cases were consolidated along with a third action, a description of which is not necessary for our purposes. The trial judge, after instructing the jury, submitted nine special interrogatories, five of which applied to the two actions we described. In these two cases, the decedent was found negligent and liable in damages to plaintiffs. Both defendants, the dealer, and manufacturer, were found not liable for breaches of warranty, and the dealer not liable for negligence to the two sets of plaintiffs. The trial judge entered judgment on the special interrogatories as they were returned. Thereafter, he ruled in favor of each cross-defendant and denied any recovery on any cross-claim asserted by the estate. The estate appealed contending that it should have been granted a new trial on the cross-claims because the special interrogatories, upon which judgment was entered for plaintiff, omitted questions relating to the cross-claims.

The Second Circuit ruled, inter alia, that "[a]s to the claimed erroneous omission from the special verdict questions of questions relating to the cross-claims, * * * any objections [appellants] may have been entitled to make were waived by its subsequent failure to bring exceptions to the omission to the attention of the trial judge." 518 F.2d at 160.

Here, appellants essentially claim that the special interrogatory omitted any issues dealing with its counterclaim of unfair competition, or alternatively, that no special interrogatory was submitted dealing with their counterclaim, and that the trial judge erred, after entering judgment in plaintiffs-appellees' favor, by dismissing their counterclaim. We are of the opinion that this case is sufficiently similar to the *Cote* case in the above-described material respects to warrant the same result on the Rule 49(a) question. We therefore reject appellants' argument that they are entitled to a new jury trial on their unfair competition claim after having waived that right. In addition, the dismissal of the unfair competition

claim was proper. Under Rule 49(a), the trial court is deemed to have found against defendants on factual issues not submitted to the jury.

In summary, we are unpersuaded that any reversible error was committed at the trial below, and we affirm, in all respects, the final judgment appealed from, entered in the district court on June 11, 1981. Judgment is hereby

AFFIRMED.