UNITED STATES of America,
Plaintiff–Appellee,

v.

Moon H. KIM, Defendant–Appellant.

No. 95–3922.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1996.

Decided April 21, 1997.

Orest S. Szewciw, Office of the U.S. Attorney, Dyer, IN, Gary R. Allen, David I. Pincus, Sara S. Holderness (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, Samuel D. Brooks, Office of the U.S. Attorney, Civil Division, Chicago, IL, for Plaintiff–Appellee.

Alan R. Dolinko, Cary S. Fleischer (argued), James W. Naisbitt, Albert L. Grasso, Chuhak & Tecson, Chicago, IL, for Defendant–Appellant.

Before COFFEY, MANION and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Defendant Moon H. Kim (Kim) was one of three co-owners of a corporation that failed to pay federal employee withholding taxes during certain segments of the years 1989 to 1991. Kim was assessed a penalty by the IRS and he refused to pay the same, forcing the government to commence this civil action to reduce the assessment to a judgment. In its complaint, the government alleged that the three co-owners were personally liable for the taxes the corporation had failed to pay. One of the co-owners, Thomas Ryan (Ryan), consented to judgment against him, and the case proceeded to trial against the other two owners, Kim and Billy Joe Marquess (Marquess). Following a jury trial, the district judge granted the government's renewed motion for judgment as a matter of law as to Kim's liability for the periods as-

sessed. Kim moved for a new trial, requesting reversal of the trial court's grant of judgment, and asserting two more errors. He appeals from the denial of that motion.[1] We affirm.

## I. BACKGROUND

In August 1986, Kim, Ryan and Marquess purchased Guildcrest Furniture Industries, Inc., a furniture manufacturer located in Peru, Indiana. The three formed a corporation, known as Guildcrest Associates, Inc. (Guildcrest), and each owned one-third of the stock. To finance the initial investment, Kim, Ryan and Marquess each individually contributed $30,000 and all three cosigned an installment note, in the total amount of $394,-954.93, making each of them, Ryan, Marquess and Kim individually responsible for the entire $394,954.93.

Under the corporate structure established at the time of purchase, Kim, Ryan and Marquess comprised Guildcrest's board of directors. Ryan was installed as the company's president, Marquess as the vice-president of manufacturing, and Kim the vice-president for finance. Kim, who resided in Oak Brook, Illinois, commuted to the company's headquarters in Peru, Indiana, an average of two or three days a week for approximately the first two years of the company's operations (August 1986 through September 1988). During this time, Kim handled all of the company's accounting matters, prepared and signed the company's tax forms, participated in the company's management and decision making process, and was also an authorized signatory on the payroll and general checking accounts that Guildcrest maintained at Wabash Valley Bank and Trust Company (WVBT).[2]

After September 1988, Kim began to spend less time at Guildcrest's headquarters in Peru, primarily because his other business interests began to expand rapidly and required more of his time. Thus, the three owners agreed in late 1988 to hire another full-time person, Allen Fowler (Fowler), to undertake a variety of the day-to-day accounting responsibilities formerly handled by Kim. Kim no longer had responsibility for federal withholding taxes, and Fowler was made an authorized signatory on the company's checking accounts. During 1989, Kim only visited the company's headquarters about once per month, and during 1990, he visited the headquarters only five times. However, during that period, Kim continued his interest as an owner, officer, and member of the board of directors of Guildcrest. Ryan testified that all significant financial decisions were still handled by the three owners in concert, and Kim was not excluded from those matters. Ryan also testified that he spoke with Kim over the phone approximately once per week regarding financial matters throughout 1989.

During 1989 and 1990, Kim also participated in a variety of other activities on behalf of Guildcrest. He handled matters related to moneys due and owing Guildcrest from Sibilano Furniture, one of Guildcrest's largest customers. He also dealt with certain of Guildcrest's suppliers located in the Chicago area, and served as the company's contact person with a bank (other than WVBT) which provided credit to Guildcrest for overseas purchases of supplies. Finally, Kim travelled to Korea in 1990 in an attempt to secure investors and sales for Guildcrest.

Neither did Kim's activities with the check writing and financial management of Guildcrest cease entirely in 1988, as he remained an authorized signatory on the company's checking accounts, and signed twelve checks to one of Guildcrest's suppliers in October 1989. Kim also authorized payment of a check to himself in March 1990 in the amount of $1,311.23.

According to the testimony of Ryan, Guildcrest began to experience cash shortfalls in late 1987 or early 1988, largely due to its inability to continue to obtain the fabric and

---

1. The jury found Marquess liable for four of the seven quarters for which he was assessed, and the judge entered judgment accordingly. Marquess is not a party to this appeal.

2. Under the terms of those accounts, the signature of any one of the three owners was sufficient to issue payroll checks, except when withdrawing funds from the general account when two of the co-owners' signatures were required.

wood carvings necessary for the manufacture of its furniture. Guildcrest sought alternative sources, but was unsuccessful. To address the cash shortfall problem, the company sought additional financing from a variety of sources, including WVBT. WVBT had provided Guildcrest with a $200,000 revolving line of credit in 1986 when the company began operations, and at that time, Kim, Ryan and Marquess signed a security agreement granting WVBT a secured interest in Guildcrest's accounts receivable, inventory, furniture and fixtures. Under the terms of the security agreement, Guildcrest's assets were to serve as security for "the payment and performance of each and every debt, liability and obligation of every type and description which [Guildcrest] may now owe or at any time hereafter owe to [WVBT] (whether such debt, liability or obligation now exists or is hereafter created)." Gov't Ex. 137. The security agreement also went so far as to include a provision that Guildcrest's customers were to send their payment checks to the company "lock box," which was a post office box exclusively under the control of WVBT. The parties agreed that WVBT would apply fifty percent of the proceeds to the debt, and deposit the remaining fifty percent balance of the customer's check into Guildcrest's operations checking account.

WVBT ultimately agreed to provide a variety of additional financial assistance to Guildcrest throughout 1987 and 1988, which included increasing the already-existing line of credit, and also included making loans directly to Kim, Ryan and Marquess personally, and each was individually responsible for the total amount of the new loans. At this same time WVBT's security interest was reaffirmed with the extension of the additional credit, and the lock box arrangement was continued, and would in fact continue throughout Guildcrest's existence. An official from WVBT testified that, absent the personal written guarantees of Kim, Ryan and Marquess, the bank would not have been willing to renew Guildcrest's line of credit nor extend credit to any of the owners individually.

Despite WVBT's continuous advances to Guildcrest, the company continued to struggle financially throughout the latter part of 1989, thus causing the owners to discuss the possibility of liquidating the company. To that end, Kim, Ryan and Marquess met with representatives of WVBT on November 16, 1989, for the purpose of proposing a liquidation plan, and to seek an additional $20,000 from WVBT in order that they might be able to purchase supplies for completion of the work on inventory, which would in turn be sold at liquidation. WVBT ultimately approved the proposed liquidation plan and agreed to extend the latest $20,000 to Guildcrest, on the condition that each of the owners again agree to sign a promissory note assuming joint and several liability for the full $20,000. The liquidation plan was put into effect in December of 1989, but was not entirely successful, as not all of the furniture was completed. Guildcrest filed for bankruptcy in April 1990, and ceased operations in February 1991.

Beginning in 1989, Guildcrest failed to pay the federal income and social security taxes withheld from its employees' wages for certain specific taxable periods; namely all four quarters of 1989, the first and second quarters of 1990, as well as the first quarter of 1991. Instead, the company applied these funds to payment of the company's operating expenses. Kim testified that he became aware of the problem when he was initially informed about the company's withholding tax problem in September 1989, when Ryan informed him by phone of the shortfall of a few thousand dollars. Kim stated that he first became aware of the magnitude of the shortfall at the November 16, 1989 meeting in which the liquidation plan was proposed to WVBT, and at this time the company's unpaid tax liability exceeded $70,000. Kim finally testified that, as payment of the back taxes was a part of the proposed liquidation plan, and Ryan had prepared the plan, he believed that the taxes would be paid as the plan was executed.

The $70,000 in unpaid withholding taxes were not paid as the liquidation plan was executed after the November 1989 meeting; indeed, unpaid withholding taxes continued to accrue while the company continued operating throughout 1990 and until February 1991, when the company ceased doing busi-

ness. Ultimately, the IRS assessed each of the owners personally for the unpaid withholding taxes. According to the terms of the assessments, each owner was liable for the full amount of unpaid withholding taxes, as opposed to a *pro rata* share. Kim was assessed for all four quarters of 1989, along with the second quarter of 1990 and the first quarter of 1991, while Ryan and Marquess were assessed for each of those quarters as well as for the first quarter of 1990. The assessments for the 1989 quarters totalled approximately $86,000. On November 22, 1993, the government brought a civil action pursuant to 26 U.S.C. § 7401 in the federal district court against Kim and Marquess[3] seeking to reduce the assessments to judgment. Guildcrest's bank records were introduced at trial, and they helped establish that, in the fourth quarter of 1989, Guildcrest disbursed over $500,000 from its payroll and general checking accounts for payment of various operating expenses. These disbursements did not represent monies designated for WVBT under the terms of the security agreement, but represented payments to various unsecured creditors. During December 1989, by which time the parties agree that Kim was aware of the full extent of Guildcrest's unpaid tax liability, such payments totalled almost $200,000.

Kim sought to introduce in evidence a letter he received from the IRS stating that Kim was not responsible for Guildcrest's failure to pay withholding taxes during the first quarter of 1990. The trial judge refused to permit Kim to introduce the letter, ruling that, since the government was not seeking to recover from Kim for the first quarter of 1990, the letter was not relevant; he did, however, permit the government to introduce evidence of Kim's involvement in Guildcrest's affairs during the first quarter of 1990. Kim did introduce a letter signed by Ryan and Marquess which stated that, from 1989 through February 1991, Kim was not active in the daily business affairs of Guildcrest, and furthermore that he (Kim) neither prepared nor signed any tax forms during those periods.

After presentation of all the evidence, the government moved for judgment as a matter of law against Kim, arguing that he was liable for Guildcrest's unpaid withholding taxes for the six quarters for which he had been assessed. The district court denied the motion. The case went to the jury, and the jury found that Kim was liable for only the fourth quarter of 1989, the second quarter of 1990, and the first quarter of 1991; and furthermore it returned a verdict finding that Kim was not liable for the first three quarters of 1989. The government then renewed its motion for judgment as a matter of law against Kim with respect to the first three quarters of 1989, and the trial judge this time granted the motion. Kim subsequently filed a motion for a new trial, arguing that the trial court erred in granting the government's renewed motion for judgment as a matter of law, asserting that the jury's finding of liability with respect to the latter three quarters for which he was assessed was against the weight of the evidence, and further claiming that the trial judge erred in permitting the government to introduce evidence of Kim's involvement in Guildcrest's affairs during the first quarter of 1991, when Kim was not assessed for that quarter. The district court denied each aspect of Kim's motion, and he appeals.

## II. DISCUSSION

### A. Statutory Framework

The Internal Revenue Code requires employers to withhold income and Federal Insurance Contribution Act taxes from their employees' wages. The amounts collected from the employees' wages are considered to be held by the employer in trust for the United States, and must be paid over quarterly. *See Slodov v. United States,* 436 U.S. 238, 244, 98 S.Ct. 1778, 1783–84, 56 L.Ed.2d 251 (1978) (citing 26 U.S.C. § 7501(a)). While it is not always required that these funds be segregated by the employer prior to being paid over to the IRS, the law is clear that the funds may not be used by the employer for any other obligations, including but not limited to operating expenses. *Id.*;

---

**3.** Ryan consented to judgment prior to the government bringing the action.

*see also Purdy Co. of Illinois v. United States,* 814 F.2d 1183, 1186 (7th Cir.1987).

Even if an employer does not pay over the taxes withheld from the employees' wages, the employees receive credit from the IRS for the amount withheld, so if the withholding taxes are not paid over to the government by the employer, the IRS will only seek to recover from the employer and will not seek to recover the amounts from the employees. In such circumstances, the IRS may seek satisfaction of the unpaid tax liability by creating a lien against the employer's property, and may eventually "levy, distrain, and sell the employer's property in satisfaction [of the lien]." *Slodov,* 436 U.S. at 244, 98 S.Ct. at 1784 (citing 26 U.S.C. § 6321). In the alternative, "the officers or employees of the employer responsible for effectuating the collection and payment of trust-fund taxes who willfully fail to do so [may be] made personally liable to a 'penalty' equal to the amount of the delinquent taxes." *Slodov,* 436 U.S. at 244–45, 98 S.Ct. at 1784; *see also United States v. Schroeder,* 900 F.2d 1144, 1145–46 (7th Cir.1990).

Under section 6672 of the U.S. Code, a person must meet two criteria to be personally liable for unpaid taxes for a given quarter. First, he must be "required to collect, truthfully account for, and pay over" the tax. A person meeting this criterion is commonly referred to as a "responsible person." *E.g., Slodov,* 436 U.S. at 245, 98 S.Ct. at 1784; *Bowlen v. United States,* 956 F.2d 723, 727 (7th Cir.1992). Second, it must be established that the "responsible person" "willfully" failed to collect, account for or pay over the tax owed. "Willful" in this context means that the person either knew the taxes were not being turned over to the government and nonetheless opted to pay other creditors, or recklessly disregarded a known risk that the taxes were not being paid over; the government is not required to establish that the responsible person deliberately

sought to defraud the government. *Thomas v. United States,* 41 F.3d 1109, 1114 (7th Cir.1994); *Domanus v. United States,* 961 F.2d 1323, 1326 (7th Cir.1992).[4]

When seeking to recover unpaid withholding taxes from individuals, the IRS initially determines that the individual was a responsible person and that the individual willfully failed to pay over the taxes, and makes an assessment for each quarter in which the IRS has determined that individual to be both responsible and willful. The IRS then commences, as it did here, an action to reduce the assessment to judgment, and the individual against whom the assessment has been made bears the burden of proving his lack of responsibility and/or willfulness for the given tax quarters. *United States v. Running,* 7 F.3d 1293, 1297 (7th Cir.1993) (quoting *Ruth v. United States,* 823 F.2d 1091, 1093 (7th Cir.1987)).

Even if a "responsible person" is unaware that withholding taxes have gone unpaid in *past* quarters, it is settled law that a responsible person who *becomes* aware that taxes have gone unpaid in past quarters in which he was also a responsible person, is under a duty to use all "unencumbered funds" available to the corporation to pay those back taxes. This was first established as the law of this circuit in 1979 in the case *Garsky v. United States,* 600 F.2d 86, 91 (7th Cir.1979) (citing *Mazo v. United States,* 591 F.2d 1151 (5th Cir.1979)). *See also Honey v. United States,* 963 F.2d 1083, 1089 (8th Cir.1992). This duty extends not only to funds available to the corporation at the time the responsible person becomes aware, but also to any *unencumbered funds acquired thereafter. Garsky,* 600 F.2d at 91. If the responsible person fails to use such unencumbered funds to satisfy the past unpaid liability, he is deemed personally liable for the taxes that went unpaid in the past while he was responsible. The responsible

4. Specifically, section 6672 reads in pertinent part as follows:

"Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over." 26 U.S.C. § 6672(a) (1989).

person deemed liable for the unpaid liability of past tax quarters is considered to have "willfully" failed to pay over the taxes for those past quarters, even though he was unaware at that time that the taxes were going unpaid. *Id.* The one limitation on this is that the person is only liable to the extent that "unencumbered funds" are available or acquired after the time in which that person becomes aware. See *Huizinga v. United States*, 68 F.3d 139, 145 (6th Cir. 1995) (affirming grant of summary judgment for taxpayer where funds available to satisfy liability were encumbered by trust).

## B. The District Court's Grant of Judgment as a Matter of Law

In Kim's case, the jury, using special verdict forms,[5] returned a verdict finding Kim to be a "responsible person" for each of the six quarters alleged, including all four quarters in 1989. The jury also determined, however, that Kim did not "willfully" fail to. pay over the taxes until the *fourth* quarter of 1989. In other words, though the jury concluded that Kim was a "responsible person" with respect to Guildcrest's failure to pay over withholding taxes for the year 1989, it concluded that Kim's failure to pay over the funds did not rise to the level of a "willful" refusal to remit the withholding taxes to the government for the first three quarters of 1989.

Following the jury's verdict, the government renewed its motion for judgment as a matter of law[6] dealing with Kim's liability for the first three quarters of 1989. The government argued that, under the rule established in *Garsky*, Kim was willful as a matter of law with respect to the first three quarters of 1989. The trial judge agreed with the government and ruled that, because Kim was a "responsible person" for the first three quarters of 1989, and failed to use all unencumbered funds acquired by Guildcrest after he became aware of the unpaid taxes to pay the taxes which had accrued during those three quarters, Kim was liable for the unpaid tax liability which accrued during the first three quarters of 1989. Thus, the judge overruled the jury's verdict that Kim was not "willful" for the first three quarters of 1989, and entered judgment against Kim for the six quarters he was assessed.

In ruling that Kim was liable as a matter of law for the full extent of the unpaid tax liability created during 1989, the trial court concluded that the evidence was *undisputed* that Guildcrest had more than sufficient unencumbered funds after Kim became aware (at the latest in November 1989) of the unpaid tax liability from the first three quarters of 1989 to satisfy the liability for those three quarters, but he did not use those funds to satisfy that liability. Based on that finding, the trial · judge determined that Kim was liable for the *full extent* of the unpaid tax liability for the first three quarters of 1989. Kim argues that the district court erred in granting the government's renewed motion for judgment against him as a matter of law with respect to whether he "willfully" failed to pay withholding taxes for the first three quarters of 1989. We disagree.

 We review the district court's grant of judgment as a matter of law *de novo*. *Bowlen*, 956 F.2d at 727. If the only reasonable conclusion permitted by the evidence is that the taxpayer is liable, the grant of judgment as. a matter of law is proper. *See id.*

At the outset, it is important to understand what constitutes "unencumbered funds" for purposes of ability to satisfy past tax liability, for Kim argues, in effect, that the trial judge made an improper factual determination that sufficient unencumbered funds were available to Guildcrest at the time and/or after Kim became aware of the past tax liability which could have been used to satisfy that liability. Thus, because our review of the entry of judgment as a matter of law requires us to determine whether there were disputed facts presented concerning this issue, we consider the definition of "unencumbered funds."

 Both the government and Kim failed in their briefs before the trial court on the government's motion for judgment as a matter of law to address or apply the proper

---

5. *See* Fed.R.Civ.P. 49(a).

6. *See* Fed.R.Civ.P. 50(b).

definition of "encumbered funds."[7] In granting the government's motion, the trial court noted that this circuit has not adopted a definition of unencumbered funds. The district judge therefore adopted the test expressed in the Eighth Circuit case *Honey v. United States*, 963 F.2d 1083 (8th Cir.1992), which he observed was "concise and reflects the appropriate breadth." Neither of the parties has urged any other test upon us on appeal (nor did Kim argue in his motion for a new trial that the *Honey* definition was erroneous), and our research fails to reveal any circuit that has adopted a competing test.[8] Thus, because we agree that *Honey* provides a proper and acceptable definition of "unencumbered funds" for purposes of § 6672, we adopt its definition:

> [F]unds are encumbered only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and if that legal obligation is superior to the interest of the IRS in the funds.

963 F.2d at 1090.[9] The taxpayer bears the burden of proving that no unencumbered funds were available to satisfy the delinquency, as this inquiry is part of the larger inquiry into the taxpayer's "willfulness". *See Barnett v. Internal Revenue Service*, 988 F.2d 1449, 1458 (5th Cir.1993).

The *Honey* case not only provides the appropriate definitional framework for us to consider whether there were unencumbered funds available to Guildcrest, it also provides the proper analytical framework as well. From a factual standpoint, the case is similar to the case at bar. Defendant Honey, along with certain other principals in a business enterprise that failed to pay its withholding taxes, was assessed for the second, third and fourth quarters of 1985. In a court action tried before a jury on special verdicts to reduce the assessment to judgment, Honey was found to have been a "responsible person" for all quarters, but was found to have been "willful" only for the fourth quarter. In that case, the issue at trial of whether "unencumbered funds" were available to Honey's business was *specifically* reserved for the trial court, which adopted a narrow test for "unencumbered funds" and ruled that no such funds existed.[10]

The Eighth Circuit in overturning the district court ruled, as a matter of law, that unencumbered funds were available during the fourth quarter sufficient to pay the liability. Honey argued that a bank's properly-perfected security interest in the company's proceeds and accounts rendered the funds "encumbered," and thus unavailable for use to repay the liability. The Eighth Circuit acknowledged that a security interest of this nature is superior to the interest of the IRS. However, the Eighth Circuit held that, because there was no evidence that the bank holding the security interest *in fact* sought or attempted to prevent funds from being used to satisfy the tax obligation, the funds were "unencumbered" as a matter of law.

In the present case, unlike *Honey*, the record does not reveal any indication that the parties ever discussed if the question of whether there were "unencumbered funds" available to satisfy the unpaid withholding tax liability would be addressed by the jury

---

7. The argument in the parties' briefs focused not on the proper definition of "unencumbered funds," but on whether, under application of the *Garsky* rule, Kim was under a duty to use such funds to pay past unpaid withholding taxes. We address this issue *infra*.

8. The Ninth Circuit noted a broader test embodied in *In re Premo*, 116 B.R. 515, 535 (Bankr. E.D.Mich.1990), which would consider funds encumbered where restrictions which, "while perhaps not legally enforceable, may be practically irresistible because they arise out of the disparity of bargaining power as between the taxpayer and its source of financing." *Purcell v. United States*, 1 F.3d 932, 939 (9th Cir.1993). The Ninth Circuit found it unnecessary to adopt a standard in that case, since the taxpayer failed to carry his burden of establishing encumbered funds under either standard. *Id.*

9. The Fifth Circuit has also adopted this definition. *See Barnett v. Internal Revenue Service*, 988 F.2d 1449, 1458 (5th Cir.1993). The Sixth Circuit, while not expressly adopting the *Honey* definition, has cited and applied it approvingly. *See Huizinga v. United States*, 68 F.3d 139, 145 (6th Cir.1995).

10. The district court in *Honey* determined that, when a corporation has to use revenue to keep its operations going and pay its employees, its funds are "encumbered" and thus unavailable to satisfy past unpaid withholding tax liability.

or specifically reserved for the judge. Kim argues that the trial court, in ruling that Kim was liable for the past unpaid taxes, denied him a jury finding on whether such "unencumbered funds" were available to Guildcrest after Kim learned of the past tax liability. Pointing to the conclusion in *Honey* that a properly-perfected security interest is superior to an IRS tax lien, Kim directs our attention to the security agreement WVBT held in Guildcrest's accounts receivable as evidence that Guildcrest simply was not free to use the money from its checking accounts to satisfy the unpaid tax liability. The government, pointing to the testimony of a WVBT official that the bank did not control how Guildcrest utilized the 50% of incoming receipts not applied to the loans, asserts that, as in *Honey,* the evidence was undisputed that WVBT did not *in fact* exercise any control over the 50% of Guildcrest's incoming receipts thus encumbering them from use.

Initially we observe that, while not argued by the government, it appears to us that Kim's protestation that the district court deprived him of a jury verdict on the unencumberedness issue fails to take into account that the jury in this case returned only special verdicts pursuant to Rule 49(a). Under the terms of Rule 49(a), the trial court may require the jury to return "only a special verdict in the form of a written finding upon each issue of fact." Such verdicts are designed to clarify the jury's findings, as well as facilitate appellate review, particularly where the special verdicts help to "articulate the issues of fact subsidiary to the legal questions." *Byrne v. Board of Educ., School of West Allis–West Milwaukee,* 979 F.2d 560, 568 (7th Cir.1992) (citing cases); *see Stewart & Stevenson Services, Inc. v. Pickard,* 749 F.2d 635, 644 (11th Cir.1984). When special verdicts under Rule 49(a) are to be used, the trial court should submit forms for each of the factual issues it wishes to be answered to the jury necessary to support an entry of judgment. *See Stewart,* 749 F.2d at 643; *United States v. Real Property Located at 20832 Big Rock Drive,* 51 F.3d 1402, 1408 (9th Cir.1995) (district court has discretion with respect to the forms of special verdict "provided the questions asked are reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment").

However, while it is the duty of the trial court to provide the jury with the proper verdict forms, it is the *independent duty of the party seeking jury resolution of an issue of fact to submit a form on that issue to the court for presentation to the jury.* As the Rule states:

If in [instructing the jury and submitting forms] the court omits any issue of fact raised by the pleadings or by the evidence, *each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.* Fed.R.Civ.P. 49(a) (emphasis added).

■ Thus, while it may be true that, if Kim had presented evidence sufficient to create a genuine issue of fact, he had a right to receive a jury verdict on the issue of whether there were "unencumbered funds" available at the time he became aware or whether the company acquired such funds after that time, it was his duty *alone* to request that the judge submit those issues to the jury. Kim failed to request the submission of those particular issues to the jury, and his failure to do so constitutes a waiver on his part of a jury resolution of those issues. *See Matei v. Cessna Aircraft Co.,* 35 F.3d 1142, 1146–47 (7th Cir.1994); *Pielet v. Pielet,* 686 F.2d 1210, 1217–18 (7th Cir.1982).

The trial court, in granting the government's motion for judgment as a matter of law, concluded that the undisputed facts which revealed that in excess of over $200,-000 passed through Guildcrest's checking accounts in December, established that there were sufficient unencumbered funds available to Guildcrest subsequent to the time Kim became aware in November of the past liability to satisfy that liability. Because Kim waived his right to a jury trial on the issue of whether unencumbered funds existed by not demanding a jury determination on that is-

sue, the trial judge, under Rule 49(a), could have made this ruling *even if* conflicting evidence had been presented. *See* Fed.R.Civ.P. 49(a) ("As to any issue [of fact] omitted without such demand [by the parties] the court may make a finding[.]"). However, as the government has failed to make this argument, and it is not dispositive to the outcome of this appeal, we will review the district judge's ruling to determine whether the *undisputed* evidence showed that "unencumbered funds" were available after Kim became aware of the unpaid tax liability which could have been used to satisfy that liability.

■ Upon reviewing the record, we are of the opinion that the trial court did not err in concluding that the undisputed evidence showed that unencumbered funds were available to Guildcrest. Kim himself testified that he learned for the first time about the unpaid tax liability in a phone conversation with Ryan in September 1989. Nonetheless, accepting Kim's testimony as truthful that he did not learn of the *extent* of the unpaid tax liability until November 16, 1989, we will assume that the trial court could only consider funds which became available after that date in determining whether any "unencumbered funds" existed. On this point, Guildcrest's undisputed bank records established that, during December, over $200,000 was disbursed from Guildcrest's two checking accounts to *unsecured* creditors. An official of WVBT testified that the bank had no control over how Guildcrest used the 50% of the money not automatically allotted to payment of debt, and that testimony was unrebutted by any evidence of efforts by WVBT to control disbursal of those funds. Thus, it is undisputed that, after Kim learned of the extent of the unpaid tax liability, over $200,000 in unencumbered funds became available and were disbursed to Guildcrest's creditors whose interests in the money were inferior to that of the IRS. *See Honey*, 963 F.2d at 1092 (where evidence demonstrated that

bank with perfected security interest in taxpayer's account did not restrict taxpayer's ability to use funds, those funds were, as a matter of law, not encumbered). Because there were more than sufficient funds to have satisfied the roughly $86,000 liability for 1989, we conclude that the trial court's ruling was proper and that sufficient unencumbered funds existed to satisfy the unpaid tax liability accrued over the first three quarters of 1989.[11]

■ Kim's final argument is that, because the trial court rejected the government's request that the jury be instructed on the law of *Garsky* concerning the use of "unencumbered funds" to pay past withholding taxes, he was not on notice that whether the funds were "unencumbered" was an issue. Initially we observe that the government included its request for an instruction concerning unencumbered funds with its proposed jury instructions submitted to the court prior to trial. We further note that, in all probability as a matter of trial strategy, Kim did not object to the trial court's failure to include such an instruction, undoubtedly feeling, at that point, that it was beneficial to him. Thus, he waived his right to challenge the omission of the instruction on appeal. *See Wilson v. Kelkhoff*, 86 F.3d 1438, 1442 (7th Cir.1996) ("A party waives an argument on appeal if that argument related to a jury instruction and he failed to object to the relevant jury instruction below."); *Sims v. Mulcahy*, 902 F.2d 524, 535 (7th Cir.1990); *see generally* Fed.R.Civ.P. 51. Further, both parties examined witnesses throughout the trial concerning WVBT's interest in and control over the accounts, as well as the date Kim became aware of the unpaid tax liability. Thus, we conclude that Kim was on notice that the issue of whether the funds in Guildcrest's accounts were encumbered was present in this case.

11. Kim argues that, as a practical matter, the funds which flowed through Guildcrest's accounts would not have existed had any such funds actually been used to pay the IRS, since Guildcrest would have gone bankrupt had those funds not been used to pay operating expenses. This argument is unavailing. As the Eighth Circuit noted in *Honey*, a business may not seek to avoid payment of its withholding taxes on the ground that the failure to pay will keep the business afloat for awhile longer, as this would make the government "an unwilling partner in a floundering business." 963 F.2d at 1093 (quoting *Collins v. United States*, 848 F.2d 740, 742 (6th Cir.1988)).

Finally, as the district court noted, it was not necessary to instruct the jury concerning the *legal* effects of their *factual* conclusions, as the jury's role in a case tried with special verdicts is only to make the factual determinations on those issues submitted for their consideration, and it is the court which applies the appropriate legal principles to those factual findings. *See Thedorf v. Lipsey*, 237 F.2d 190, 193 (7th Cir. 1956); *see generally* 9A Wright & Miller, *Federal Practice and Procedure* § 2509 (1995); *accord Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir.1996) ("[W]here the jury has returned a special verdict, the trial judge is obligated to apply appropriate legal principles to the facts found by the jury.") (citing *Thedorf*); *Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1452 (Fed.Cir.1984) ("[Rule 49(a) ] contemplates that only factual questions will be submitted to the jury to which the judge will then apply the law, supplementing, if necessary, any factual determinations not submitted to the jury.").

As to the application of the *Garsky* rule that responsible persons are under a duty to use unencumbered funds to satisfy past unpaid withholding taxes to Kim, it is so straightforward as to be obvious. *Garsky* adopted in this circuit the rule of *Mazo v. United States*, 591 F.2d 1151 (5th Cir.1979), and like the *Garsky* panel, we see no need to attempt to state it any better than did the Fifth Circuit:

> In the case of individuals who are responsible persons both before and after withholding tax liability accrues ... there is a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation; failure to do so when there is knowledge of the liability ... constitutes willfulness. *Garsky*, 600 F.2d at 91 (quoting *Mazo*, 591 F.2d at 1157).

Kim was found by the jury to be a "responsible person" both before and after the liability accrued, and the evidence was undisputed that, at the latest, he acquired knowledge about the unpaid liability on November 16, 1989. During December 1989, sufficient unencumbered funds were acquired by Guildcrest to satisfy that liability, but the funds were used instead to pay other, unsecured creditors. Under these circumstances, the trial court properly ruled that Kim was under a duty to use those unencumbered funds to pay the past withholding tax liability, and that he was "willful" as a matter of law for the first three quarters of taxable year 1989 because of his failure to do so. Therefore, the judge properly granted the government's renewed motion for judgment as a matter of law.

## C. The Jury's Verdict that Kim was a "Responsible Person"

Kim next argues that the district court erred in denying his request for a new trial on the ground that the jury's verdict that he was a "responsible person" for all quarters alleged was against the weight of the evidence. We disagree.

A motion for a new trial may be granted where the jury's verdict is against the weight of the evidence. *Thomas v. U.S.*, 41 F.3d 1109, 1120 (7th Cir.1994) (quoting *Sokol Crystal Prods., Inc. v. DSC Comms. Corp.*, 15 F.3d 1427, 1432 (7th Cir.1994)). We review the district court's ruling on a motion for a new trial for abuse of discretion, viewing the evidence in the light most favorable to the party that prevailed at trial. *Id.*

A "responsible person" for purposes of § 6672 is an individual who has significant control over the disbursal of corporate funds. *Bowlen*, 956 F.2d at 728; *Purdy Co. of Illinois*, 814 F.2d at 1188. One need not have exclusive or absolute control over the corporation's affairs to be a "responsible person;" all that is required is that the individual "could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees." *Thomas*, 41 F.3d at 1113. "In effect, responsibility under section 6672 encompasses all those connected closely enough with the business to prevent the default from occurring." *Bowlen*, 956 F.2d at 728. Indicia of "responsible person" status include: holding corporate office, owning stock in the company, serving on the board of directors, possessing authority to sign checks, and control over corporate finan-

cial affairs. *See Thomas,* 41 F.3d at 1114; *Bowlen,* 956 F.2d at 728; *Domanus,* 961 F.2d at 1324–25; *Garsky,* 600 F.2d at 88.

The thrust of Kim's argument is that, because he did not spend a great deal of time on Guildcrest's physical premises beginning in 1989, and did not (as evidenced by the letter signed by Ryan and Marquess) participate actively in the daily affairs of the corporation, he could not be a "responsible person." As to his status as officer, director, and part owner of Guildcrest, Kim asserts that he had "authority in name only." Br. of Appellant at 18.

The record reveals, however, that while Kim may not have been physically present for much of 1989 and 1990, he had not relinquished his official titles within the corporation and never sold or diluted his ownership interest. He remained an authorized signatory on Guildcrest's checking accounts throughout all periods, and in fact signed checks to a supplier of Guildcrest's in October 1989 and to himself in March 1990. Ryan testified that, at no point did Kim ever lose his authority within the company, and Ryan further testified that he continued to speak with Kim about financial matters and when large bills were to be paid approximately once per week in 1989.

The record also demonstrates that Kim actively participated in a variety of other facets of Guildcrest's business as well. He continued throughout 1989 to handle an account in Chicago with Sibilano Furniture, one of Guildcrest's largest customers. He also dealt with two of Guildcrest's suppliers throughout 1989. Kim travelled to Korea in 1990 to seek new customers and investors for Guildcrest. Finally, Kim was an active participant in the various financing arrangements made by Guildcrest in 1989, including signing a renewed letter of credit for the company in June 1989, and attending the November 16 meeting at which Guildcrest's liquidation was proposed.

We bear in mind that it was Kim who bore the burden of disproving his status as a "responsible person" for the jury. *Running,* 7 F.3d at 1297. Considering all of the above, and considering that no evidence was presented by Kim that his activities within the company diminished substantially at the end of 1990 or in the beginning of 1991, we conclude that the jury's verdict that he was a "responsible person" for all quarters alleged was supported by the evidence.

## D. Exclusion of Kim's Evidence Concerning the First Quarter of 1990

Kim finally argues that the trial judge erred in not allowing him to introduce a letter to him from the IRS indicating that the IRS had not assessed him as a "responsible person" for the first quarter of 1990, while permitting the government to introduce evidence of his involvement in Guildcrest's affairs during that time. We disagree.

Decisions concerning the admissibility of evidence are vested in the sound discretion of the trial court, and we will only disturb a trial court's ruling upon a showing that the ruling was an abuse of discretion such that the substantial rights of the appellant were affected. *Thomas,* 41 F.3d at 1119; *see generally* Fed.R.Civ.P. 61. This is particularly true where, as here, the district court has made a Rule 403 determination and has demonstrably balanced the prejudicial impact and probative value of the evidence offered. *Berry v. Deloney,* 28 F.3d 604, 608 (7th Cir.1994).

Kim's argument is premised not so much on the exclusion of the IRS letter itself, but rather on the fact that, notwithstanding that exclusion, the government was permitted to introduce a check he wrote from Guildcrest's account during the first quarter of 1990, when the IRS, as shown by the excluded letter, determined Kim not to be a "responsible person." Kim argues that he should have been permitted to introduce the letter to correct what he argues was the erroneous impression created by the government's introduction of the check that he was a "responsible person" for that period.

As an initial matter, we observe that Kim is wise not to focus simply on the exclusion of the IRS letter. The action brought by the government against Kim in this case did not seek recovery of any withholding taxes not paid over during the first quarter of 1990. Thus, since the IRS letter addressed Kim's responsibility for a quarter which was not at issue at trial, it is not clear to us that it was relevant at all. *See* Fed.

R.Evid. 402 ("Evidence which is not relevant is not admissible."). Further, the jury's duty in this case was to make an independent determination as to Kim's liability for the quarters in which he was actually assessed, *see Ruth,* 823 F.2d at 1094, and the trial court, applying Evid.R. 403, concluded that there existed a real possibility that the jury would focus erroneously on the IRS' conclusion concerning a quarter that was not even at issue to the exclusion of the evidence presented concerning the relevant quarters. Such a conclusion was within the trial court's discretion.

The trial court did permit the government to introduce the check written by Kim during the first quarter of 1990, reasoning that it was relevant to rebut Kim's claims that he was not actively involved with Guildcrest's affairs after September 1988. Notwithstanding Kim's protestations, we conclude that it was proper to admit the check. First, the check was relevant to rebut Kim's defense of lack of involvement after September 1988, in that it provided direct evidence of some involvement (and check writing authority) on Kim's part after September 1988. Second, the trial court specifically instructed the jury that Kim had not been assessed for the first quarter of 1990 and that it was not to make a finding concerning that quarter. As Kim has not challenged the adequacy of the limiting instruction itself, we conclude that the limiting instruction adequately focused the jury's attention on the relevant issue, *i.e.,* whether Kim was a responsible person during the quarters alleged. *See Berry,* 28 F.3d at 608 (district court's unchallenged limiting instruction cured any potential prejudice from admission of evidence which was only admissible for limited purpose). Therefore, we conclude that the district judge did not abuse his discretion in admitting the government's evidence while excluding the IRS letter.

Kim also protests the fact that the government introduced Guildcrest's bank statements for the first quarter of 1990, and made reference to the amount of money that flowed through the accounts in that quarter. However, the bank statements for the first quarter of 1990 were relevant to the government's case against Marquess, who was charged for the first quarter of 1990. It does not appear that Kim objected either to the admission of the bank statements or the government's reference to them at closing argument, nor did he seek a limiting instruction telling the jury to only consider the bank statements with respect to Marquess. Thus, he has waived any argument concerning the bank statements. *See Varhol v. National R.R. Passenger Corp.,* 909 F.2d 1557, 1567–68 (7th Cir.1990) (en banc) (per curiam).

## III. CONCLUSION

We are of the opinion that the trial court's action in granting the government's renewed motion for judgment as a matter of law with respect to Kim's willfulness during the first three quarters of 1989 was proper. Further, the jury's verdicts as to Kim's responsibility for the quarters alleged and willfulness for the fourth quarter of 1989, second quarter of 1990, and first quarter of 1991, were not against the weight of the evidence. Finally, the trial court did not err in admitting evidence that Kim wrote a check from Guildcrest's account during the first quarter of 1990, while excluding from evidence a letter written to Kim by the IRS stating that Kim would not be assessed as a "responsible person" for that quarter. We affirm.