[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#110)
The plaintiff John W. Evans brought this action in January, 1994, in the Connecticut superior court against the defendant General Motors Corporation ("GM"), seeking damages for misappropriation of trade secrets. The case was removed to the federal district court and was remanded[1] without disposition in September, 1996. GM now moves pursuant to Practice Book § 17-44
for summary judgment, asserting that undisputed material facts support each of three independent affirmative defenses to Evans' trade secret claim. First, GM contends that the complaint was CT Page 3795 filed nearly five years after Evans knew about the alleged misappropriation and therefore is barred by the three-year statute of limitations; second, the claim is barred by the general release signed by Evans in December 1989; and three, GM's use of Evans' alleged trade secret would have been permitted by two separate license agreements signed by Evans. Attached to GM's motion are supporting documents exhibits A through U. Evans opposes the motion for summary judgment, claiming that material facts are in dispute as supported by exhibits 1 through 9 appended to Evans memorandum in opposition.
"[S]ummary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Millerv. United Technologies Corp. , 233 Conn. 732, 744, 660 A.2d 810
(1995). "A material fact . . . [is] a fact which will make a difference in the result of the case. . . ." (Citations omitted; internal quotation marks omitted.) Hammer v. Lumberman's MutualCasualty Co., 214 Conn. 573, 578, 573 A.2d 699 (1990). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts. . . ." (Citations omitted.)Serrano v. Burns, 248 Conn. 419, 424, 727 A.2d 1276 (1999).
The trade secret at issue in this litigation is a novel aqueous[2] technology for cooling automobile engines, which Evans claims was misappropriated by GM and incorporated into certain of its high performance vehicles, such as the GM Corvette sports car. The technology at issue is an aqueous reverse flow cooling system, designed specifically for high performance automobile engines.
Evans and Mecca Development, Inc., had contracted with General Motors in 1988 and 1989 to do engineering work on non-aqueous cooling systems invented by Evans, who held two patents on this technology.[3] Mecca Development, Inc. was owned in part by Evans, who was its president. General Motors had agreed to pay approximately $2 million to Mecca, nearly $1.5 million of which was for Mecca's engineering work on the non-aqueous cooling technology for the GM Corvette group.
GM had a corporate policy that it would not work with outside contractors on a confidential basis. A party submitting any CT Page 3796 technology to GM would have to sign a waiver form renouncing confidentiality so that the only proprietary rights that could be asserted against GM would have to rely on a patent or authorized written agreement. Evans executed non-confidentiality agreements with GM in 1978 and again in 1990. (Exhibits N and O).
At the same time that Evans was developing his non-aqueous cooling system, he also was developing an aqueous reverse flow cooling system. A test of the non-aqueous system on a GM car was scheduled to be run at a GM facility in March of 1989. In February of 1989, GM asked Evans if he would allow GM to see the results of his aqueous technology during the same test session. Because he did not yet have a patent on the aqueous cooling system, Evans was reluctant to submit the technology on a non-confidential basis, but GM refused to modify its policy about accepting submissions in confidence. Evans compromised by agreeing orally with GM engineer Al Gunther to a "black box" demonstration in which Evans would install his aqueous system in the test car without allowing GM to view the technology. Consequently, the system would be tested but not disclosed, using the same GM test car on which Evans planned to demonstrate the non-aqueous cooling system.
Thus, in March 1989, Evans and a technician employed by Mecca converted the cooling system in the test car from the non-aqueous system to the aqueous system without involving GM employees or allowing them to view the system. GM and Evans agreed that Evans would hold the keys to the test car so that no one could gain entrance under the hood and examine the system once installed.
Evans' demonstration of the aqueous technology proceeded in this fashion at the GM test facility in Warren, Michigan. The black box testing of the aqueous system took place on March 16 and 17, 1989. The aqueous system successfully passed all of the performance tests.
At the same time, GM had been working independently on its own aqueous cooling system, but had not yet been successful. Following the black box demonstration in March 1989, two GM technicians reportedly warned Evans that GM would steal his technology. Evans also discovered on the morning of March 17th
that an access panel in the floor under the test car, outfitted overnight with the aqueous cooling system, was not in the same position it had been the previous night. This suggested to Evans the possibility of tampering and inspection by GM. Evans was CT Page 3797 assured that the access panel had been moved in routine servicing. A critical element of Evans' aqueous system, being a venting technique involving a restricter, could not be observed from beneath the car; one had to get under the hood to see it. In March 1989, following these events, Evans was very suspicious of GM: he had been warned by the GM technicians; GM was developing an aqueous system without informing him directly; the displacement of the access panel suggested that his system had been inspected without his consent; and General Motors was withholding $804,000 in billings from Mecca.
In May 1989, Evans returned to the GM test center in Warren, Michigan to make a presentation of his non-aqueous system. During that trip, Evans inspected the aqueous system that GM was developing and noticed its shortcomings, including the absence of critical features of Evans' system, such as the restricter. Again, Evans was warned by GM technicians that GM would try to use his technology without paying him for it.
Mecca's claim for unpaid invoices in the amount of $804,000 eventually was settled in December 1989 by payment of $150,000 to Mecca and a release by Mecca to GM. Evans through the balance of 1989 into 1990 continued to work with GM on his non-aqueous cooling technology.
In September 1991, Evans read in an automobile journal an article about a cooling system installed in the new Corvette engine for the 1992 model year. The system closely resembled his own aqueous system that he had installed for the black box demonstration at the GM test facility in March 1989. In July 1992, Evans filed a patent application on his aqueous system. The patent was issued on October 26, 1993.
On January 8, 1994, Evans sued GM for patent infringement and misappropriation of trade secrets. However, the aqueous cooling system had been installed in a GM Corvette and one such car was sold on June 13, 1991, more than one year before Evans filed his application for a patent on his own aqueous cooling technology. These facts proved dispositive of Evans' patent litigation.[4]
For the following reasons, the court concludes that summary judgment in favor of GM in this trade secret case is inappropriate.
 Statute of Limitations Defense
CT Page 3798
GM first contends that Evans' complaint is barred by the applicable statute of limitations. GM claims that Evans knew or should have known about the alleged misappropriation in March 1989, and thus this litigation was time barred after March 1992. In support of this defense, GM argues that the federal circuit court in dismissing the patent litigation found that Evans should have know about the misappropriation as early as March 1989. GM asserts that this judicial determination collaterally estoppes the contrary position taken by Evans in this case.
It is undisputed that General Statutes § 35-56 applies a three-year statute of limitations to a claim for misappropriation of a trade secret.[5] The question is whether the limitation period begins to run at the time of the alleged misappropriation or when there is evidence of its use. See Sokol Crystal Products,Inc. v. DSC Communications Corp. , 15 F.3rd 1427, [15 F.3d 1427], 1429 (7th Cir. 1994); see also Intermedics, Inc. v.Ventritex, Inc., 775 F. Sup. 1258, 1266 (N.D.Cal. 1991).
Essentially, GM claims that in March or at the latest in May of 1989, Evans knew or should have known about the alleged misappropriation.[6] Thus, according to GM, the statute of limitations required that suit be filed at least by May 1992. It was not initiated until January 1994, so according to GM, Evans' complaint is time barred.
Evans had fears and suspicions in March and May of 1989 that his trade secret was at risk. He had information that efforts may have been taken to examine the technology, and GM reportedly had some interest in learning his trade secret. However, he had been assured that the non-aqueous system would be incorporated into any new engine development, and in May 1989 he saw that GM had not yet incorporated a successful aqueous cooling system. Evans therefore insists that it was not until he read the September 1991 automobile journal article that his suspicions were confirmed. His discovery of the misappropriation in September 1991, being the date GM published its technology, would render the January 1994 suit timely.
GM claims that Evans is collaterally estopped from relitigating the date of the alleged misappropriation, because the March 1989 date already has been determined by the federal circuit court's decision dismissing the patent litigation. "[Collateral estoppel precludes a party from relitigating issues and facts actually and CT Page 3799 necessarily determined in an earlier proceeding between the same parties. . . ." (Citations omitted.) Dowling v. FinleyAssociates, 248 Conn. 364, 373-74, 727 A.2d 1245 (1999). The federal circuit court held in Evans Cooling Systems, Inc. v.General Motors Corp. , supra, 125 F.3rd 1453, [15 F.3d 1427] that there are no exceptions to the statutory sale bar, not even the claim of misappropriated technology. The sale in 1991 of the GM Corvette incorporating aqueous cooling technology invalidated any patent issued more than one year later. Even though the federal circuit court did write that "Evans knew GM stole the invention at the very time it was allegedly stolen,"[7] that finding was not necessary to its decision to invalidate Evans' patent. It was not necessary in that case for the court to resolve the factual issue whether Evans knew of the misappropriation in March 1989; the discussion was dicta which does not preclude litigation of the same issue in this case.[8]
The court finds that a material fact is in dispute as to when Evans discovered or should have discovered that his aqueous cooling system was misappropriated.
 The "Release" Defense
In the spring of 1989, Evans claimed that GM owed Mecca over $800,000 for work on a non-aqueous cooling system. (Exhibit H.) On December 15, 1989, following months of negotiations over outstanding invoices and in consideration of $150,000 in payments, Evans as president of Mecca executed a release providing that "[e]xcept for such claims as may arise out of this [release], Mecca Development, Inc., for itself, its attorneys, agents, successors and assigns, releases, settles, cancels, discharges and acknowledges to be fully satisfied . . . any and all claims, demands, damages . . . actions, and causes of action of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected, which Mecca Development, Inc. or anyone claiming through or under it may now or hereafter have against General Motors Corporation . . . for and arising out of or related to the work purportedly performed by Mecca. Development, Inc. for General Motors Corporation through December 12, 1989, including that work covered on the invoices listed on Exhibit A to this purchase order." (Exhibit K.)
GM contends that two of the referenced invoices, GMD-579 and GMD-580, related to the testing performed in March of 1989. The terms and conditions of the release at paragraph 15 specifically CT Page 3800 required that Mecca "agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information which Seller (Mecca) shall have disclosed or may hereafter disclose to Buyer (General Motors) in connection with the goods or services covered by" the release. According to GM, the release contemplated the March 1989 events and expressly precludes this litigation.
Conversely, Evans argues that the aqueous technology was never owned by Mecca, but is owned by Evans with a portion assigned to Evans Cooling Systems, Inc.; invoices GMD-579 and GMD-580 were both dated prior to the March 1989 demonstration; and none of the invoices referenced in the release cover the March 1989 black box demonstration at issue in this litigation. Evans, though president of Mecca, was not a party to the release and he asserts that his current claims are not made through or under Mecca. Moreover, Evans contends that he could have received the full $800,000 in December of 1989 if he had surrendered to GM his aqueous cooling technology.
The court finds that material facts are at issue with respect to the scope of the release.
 The "License" Defense
GM asserts that non-confidentiality agreements executed by Evans in 1978 and 1990 (Exhibits N and O) licensed GM to make any use of Evans' alleged trade secrets. These documents are otherwise known as "requests to consider submission" or "RCS" agreements. It is undisputed that GM had a non-confidentiality policy with regard to submission of new ideas. A party submitting a request for GM to consider an invention had a right to enforce any patent, but their only other recourse would be pursuant to an express written agreement signed by an authorized GM representative. (Exhibits N and O.) The form RCS agreement otherwise states that GM "may make any use whatever of this and any prior or subsequent related submission absolutely free and without being obligated to [the submittor] in any way."
The non-confidentiality exceptions are not applicable to the development of the aqueous cooling system at issue in this case. There was no express agreement in Evans' favor; nor was the technology patented.
Evans asserts that the RCS documents on which GM relies were CT Page 3801 executed exclusively for his submission of the non-aqueous cooling technology on which Mecca did work for GM and for which Mecca was compensated; Mecca did not own and could not enter into any agreement with respect to Evans' aqueous cooling system. Evans notes that the aqueous system was owned and developed independently by Evans personally.
Evans also argues that the RCS documents relate to "submissions of technology" and it certainly is disputed whether the aqueous cooling technology was in fact ever submitted to GM in the manner contemplated by these licensing agreements. While the March 1989 black box demonstration did involve installation by Evans of the aqueous cooling system on a GM test vehicle located in a GM test facility, the technology was deliberately hidden by Evans from GM technicians, and Evans intended to share only the results of the system's performance.
Clearly, the gravamen of this litigation is whether the RCS agreements in fact were intended to apply to the misappropriation of the technology in issue, and whether that technology in fact was "submitted" to GM, as contemplated by those documents.
 Conclusion
For all of the above reasons, GM's motion for summary judgment is denied.
ROBERT F. McWEENY, J.