WORLD WIDE PROSTHETIC SUPPLY, INC., Plaintiff-Appellant,

v.

Robert J. MIKULSKY and Karen Mikulsky, d/b/a Enterprise Machine and Voyager, Inc., Defendants-Respondents-Petitioners.

Supreme Court

*No. 00–1751. Oral argument January 15, 2002.—Decided March 19, 2002.*

2002 WI 26

(Also reported in 640 N.W.2d 764.)

For the defendants-respondents-petitioners there were briefs by *Winston A. Ostrow, Donald L. Romundson* and *Godfrey & Kahn, S.C.,* Green Bay, and oral argument by *Donald L. Romundson.*

For the plaintiff-appellant there was a brief by *Terry J. Gerbers* and *Gerbers Law Offices,* Green Bay, and oral argument by *Terry J. Gerbers.*

¶ 1. ANN WALSH BRADLEY, J. The petitioners, Robert J. Mikulsky and Karen Mikulsky, doing business as Enterprise Machine and Voyager, Inc., seek review of a published court of appeals decision that reversed a circuit court order declaring a mistrial and remanded

for a new trial.[1] They argue that the court of appeals erred in concluding that World Wide Prosthetic Supply, Inc. could recover as damages its lost profits allegedly resulting from Voyager's manufacture and distribution of a defective product incorporating World Wide's trade secret.

¶ 2. In essence, the petitioners assert that the court of appeals misinterpreted Wis. Stat. § 134.90(4)(a) (1999–2000),[2] which provides for damages in a claim for misappropriation of a trade secret. Because we determine that the phrase "actual loss" in § 134.90(4)(a) is correctly interpreted to include the damages World Wide seeks, and that evidence of such losses is admissible, we affirm the court of appeals.

## I

¶ 3. World Wide, a company that designs and distributes endoskeletal prosthetic components, entered into a manufacturing arrangement with the Mikulskys, doing business first as Enterprise Machine and later as Voyager. Pursuant to the agreement, Voyager produced components for World Wide that World Wide delivered to a number of distributors.

¶ 4. When World Wide's customers began complaining that some of the components produced by Voyager were cracked and broken, the parties' relationship deteriorated. World Wide suspected that the problems were due to manufacturing defects. After attempt-

---

[1] *See World Wide Prosthetic Supply, Inc. v. Mikulsky,* 2001 WI App 133, 246 Wis. 2d 461, 631 N.W.2d 253 (reversing a judgment of the Circuit Court for Brown County, Sue E. Bischel, Judge).

[2] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

ing to reconcile the problems with Voyager, World Wide stopped marketing the defective product and made arrangements to have a different company manufacture its components. Upon the ending of the business relationship between Voyager and World Wide, Voyager continued to manufacture and also to distribute prosthetic components, without making changes to their appearance or design.

¶ 5. World Wide sued Voyager, the Mikulskys, and Enterprise Machine (hereinafter "Voyager"), alleging that Voyager misappropriated a trade secret.[3] According to World Wide, Voyager's continued production of the prosthetic components constituted a misappropriation of a trade secret that caused World Wide to lose profits.[4] World Wide claimed that it was entitled to trade secret damages because its lost profits were due to the fact that Voyager's components were defective and that these defective components, which looked like World Wide's components, caused buyers to lose confidence in World Wide's products.

¶ 6. The case proceeded to trial, and World Wide sought to introduce evidence to show that it lost profits because Voyager continued to manufacture and distribute defective components using World Wide's trade secret. Voyager objected to the introduction of the evidence, asserting that it was not relevant in a trade secret claim. Although the circuit court initially allowed

---

[3] World Wide also made claims for breach of contract, breach of implied duty of good faith, and tortious interference with contract. The circuit court dismissed the breach of contract claim on Voyager's motion for summary judgment. These other claims are not relevant for purposes of our review.

[4] Specifically, World Wide's amended complaint alleged that it suffered damages, including loss of past and future sales and harm to its good will.

some testimony that the components were defective, the court ultimately agreed with Voyager. The court determined that the evidence was not relevant, and thus not admissible to establish damages in a trade secret claim. The court concluded that it had erroneously admitted the evidence. Voyager moved for a mistrial, and the court granted the motion.

¶ 7. World Wide petitioned the court of appeals for leave to appeal, which the court granted. The court determined that under § 134.90(4), World Wide could recover damages that were the natural and proximate result of Voyager's wrongful conduct, including losses World Wide suffered because Voyager distributed a defective product incorporating World Wide's trade secret. Therefore, the court of appeals concluded, the evidence that Voyager marketed defective products incorporating World Wide's trade secret was admissible as evidence of damages under § 134.90(4), and the circuit court erred in determining that World Wide could not introduce the evidence. The court of appeals reversed the circuit court and remanded for a new trial.

## II

██

¶ 8. The question before us is whether the court of appeals correctly interpreted § 134.90(4) to conclude that evidence that Voyager marketed defective products incorporating World Wide's trade secrets was admissible. In order to address whether such evidence is relevant, and thus admissible, we must determine whether the phrase "actual loss" under § 134.90(4)(a) may include World Wide's lost profits allegedly resulting from Voyager's manufacture and distribution of a defective product incorporating World Wide's trade secret. The interpretation and application of a statute to a

given set of facts is a question of law for our independent review. *Minuteman, Inc. v. L.D. Alexander,* 147 Wis. 2d 842, 853, 434 N.W.2d 773 (1989).

¶ 9. In answering this question we look to case law from both this state and other jurisdictions. Prior to this case, we have not had an opportunity to interpret § 134.90(4). However, since § 134.90 is Wisconsin's version of the Uniform Trade Secrets Act, we can look to decisions of other jurisdictions interpreting the Uniform Act for guidance. *See* Wis. Stat. § 134.90(7). Additionally, in addressing this question, we consider secondary authority, as well as the nature of trade secret claims under § 134.90.

### III

¶ 10. Passed by the legislature in 1986, § 134.90 adopts the Uniform Trade Secrets Act. *Minuteman,* 147 Wis. 2d at 851. Section 134.90 defines a trade secret and outlines the remedies available to those injured by trade secret misappropriation. *Id.* In *Minuteman,* this court set out a three-prong framework for the analysis of trade secret actions under § 134.90:

> When examining an alleged violation of sec. 134.90, Stats., three questions arise. First, whether the material complained about is a trade secret under sec. 134.90(1)(c), Stats. Second, whether a misappropriation has occurred in violation of sec. 134.90(2). And finally, if both of the above requirements are met, what type of relief is appropriate under sec. 134.90(3) or (4).

*Id.* at 853–54.

¶ 11. For the limited purpose of our review in this case, Voyager concedes the first prong, that the material complained about is a trade secret. In its brief and at

oral argument, Voyager initially asserted that no misappropriation occurred. However, Voyager eventually conceded at oral argument that for purposes of this court's review that it used, and thus misappropriated, World Wide's trade secret.[5]

¶ 12. Therefore, the central question presented by this case falls within the third prong of the *Minuteman* framework, the type of relief available under § 134.90. Section 134.90(4), the portion of the trade secret statute addressing damages, states in part:

> (a) ... A court may award damages in addition to, or in lieu of, injunctive relief under sub. (3). *Damages may include both the actual loss caused by the violation and unjust enrichment caused by the violation that is not taken into account in computing actual loss.* Damages may be measured exclusively by the imposition of liability for a reasonable royalty for a violation of sub. (2) if the complainant cannot by any other method of measurement prove an amount of damages which exceeds the reasonable royalty.
>
> (b) If a violation of sub. (2) is wilful and malicious, the court may award punitive damages in an amount not exceeding twice any award under par. (a).

(Emphasis added.)

¶ 13. Under the statute, total damages may be calculated by a number of measures, including, in appropriate cases, punitive damages. Our focus, how-

---

[5] Thus, the question of whether World Wide can establish that Voyager misappropriated a trade secret is not before us. That will be a question for the fact finder at trial, and Voyager disputes whether it in fact misappropriated a trade secret. The present record is somewhat unclear as to the precise nature of the trade secret that World Wide alleges Voyager has misappropriated, although it seems to involve a particular type of material used in the prosthetic components.

ever, is on the phrase "actual loss" in the statute. The statute states that damages may include "the actual loss caused by the violation . . . ." The question becomes whether "actual loss" encompasses lost profits allegedly resulting from Voyager's manufacture and distribution of defective products incorporating World Wide's trade secret.

¶ 14. As the court of appeals in this case recognized, the Seventh Circuit Court of Appeals anticipated the question before us in *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.,* 148 F.3d 649 (7th Cir. 1998). In *Micro Data,* several entities were involved in a four-way deal that led to a dispute between two software companies, Dharma and Micro Data Base Systems (MDBS). *Id.* at 651. Dharma, the defendant in the lawsuit arising from the dispute, counterclaimed and asserted a trade secret violation against MDBS. *Id.* at 652.

¶ 15. In addressing Dharma's trade secret claim, the *Micro Data* court focused on the question of whether Dharma had suffered injury. 148 F.3d at 657. Dharma put in evidence that in the course of the dispute that led to the trade secret claim, MDBS soured Dharma's relationship with another entity, who otherwise would have purchased at least 1,000 copies of Dharma's software program. *Id.*

¶ 16. The court concluded that Dharma was entitled to seek damages for its lost business. *Micro Data,* 148 F.3d at 658. Characterizing the misappropriation of a trade secret as a tort, the court in *Micro Data* reasoned that Dharma's lost business constituted reasonably foreseeable consequential damages. *Id.* The court gave an illustration to demonstrate further:

> It's as if MDBS, having stolen a program from Dharma, inserted a bug in it as a result of which the

program didn't work, and buyers blamed Dharma and refused to do any further business with it. That would be a consequence of misappropriation, and Dharma would be entitled to the foreseeable damages flowing from that consequence.

*Id.*

¶ 17. This illustration parallels the facts before us. Here, the program would be World Wide's trade secret and the program with the bug would be the defective product manufactured and distributed by Voyager that incorporated World Wide's trade secret. World Wide's lost profits would be the reasonably foreseeable damages that flow from Voyager's marketing of its own defective product.

¶ 18. Although the court in *Micro Data* was interpreting New Hampshire law, New Hampshire has adopted the Uniform Act, including its section on damages, which is materially the same as § 134.90(4). *See* N.H. Rev. Stat. Ann. § 350–B:3 (2001). Courts are to construe the Uniform Act's provisions to make uniform the law among the states, *see* § 134.90(7); N.H. Rev. Stat. Ann. § 350–B:8, and thus, *Micro Data* is highly persuasive.

¶ 19. Voyager asserts that *Micro Data* is an exceptional case and that no other authority allows for trade secret damages like those World Wide seeks. Yet, Voyager is unable to cite to any case expressly holding that such damages are not available under the Uniform Act. Instead, Voyager relies upon *Forest Labs., Inc. v. Pillsbury Co.*, 452 F.2d 621 (7th Cir. 1971), and *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427 (7th Cir. 1994), arguing that these cases illustrate that the damages World Wide seeks are not the proper

measure of damages in a trade secret action under § 134.90. Neither *Forest* nor *Sokol* supports Voyager's position.

¶ 20. The Seventh Circuit Court of Appeals in *Forest* interpreted Wisconsin law and applied the "reasonable royalty" method of computing damages, which is defined as "what the parties would have agreed upon, if both were reasonably trying to reach an agreement." 452 F.2d at 627. The court's decision in *Forest,* issued well before the adoption of § 134.90, simply illustrates one of the measures of damages now permissible under the statute. It does not speak to the proper interpretation of "actual loss" under § 134.90(4)(a), the portion of the statute we apply in this case.

¶ 21. In *Sokol,* the Seventh Circuit allowed a plaintiff to recover under § 134.90 for lost profits caused by the misappropriation of the plaintiff's trade secret. 15 F.3d at 1433. Nevertheless, Voyager interprets *Sokol* to support its position because the lost profits in *Sokol* were calculated by comparing actual sales to projected sales.

¶ 22. Contrary to Voyager's interpretation of the case, we read *Sokol* to support an interpretation of "actual loss" to include lost profits resulting from Voyager's manufacture and distribution of defective products incorporating World Wide's trade secret. The court in *Sokol* referred approvingly to the jury instruction given in the case, which stated that the jury could award lost profits so long as it determined that "the wrongful act of the defendant caused the loss." 15 F.3d at 1433.

¶ 23. The conclusion that damages such as those sought by World Wide are recoverable for a trade secret violation is supported by secondary authority discussing trade secrets. The Restatement (Third) of Unfair

59

Competition section addressing monetary relief for the misappropriation of trade secrets contains the following commentary: "A plaintiff may also recover any other proven pecuniary loss attributable to the appropriation. . . . The plaintiff is also entitled to recover losses associated with sales of its own goods at reduced prices resulting from the wrongful competition of the defendant." Restatement (Third) of Unfair Competition, § 45 cmt. e (1995). Similarly, Professor Dobbs explains that "[c]onsequential damages to the plaintiff from loss of the trade secret are recoverable if adequately proven." Dan B. Dobbs, 2 *Law of Remedies* § 10.5(3), 692 (2d ed. 1993).

¶ 24. Although much of the case law cited in these secondary sources predates the Uniform Trade Secrets Act, nothing in the commentary to the Uniform Act suggests that its drafters intended to limit the scope of damages that were available under the common law of trade secrets. If anything, the contrary is true. The Prefatory Note to the Uniform Act states that the Act "codifies the basic principles of common law trade secret protection." 14 U.L.A. 434 (Master ed. 1990).

¶ 25. The nature of an action for a trade secret misappropriation also supports an interpretation of "actual loss" to include the damages World Wide seeks. A trade secret misappropriation often is characterized as sounding in tort. *See Micro Data,* 148 F.3d at 658; *Minuteman,* 147 Wis. 2d at 851; *see also RTE Corp. v. Coatings, Inc.,* 84 Wis. 2d 105, 115, 267 N.W.2d 226 (1978). The availability of punitive damages under § 134.90(4)(b) suggests that the misappropriation of a trade secret under § 134.90 is properly conceived of as a tort-type action. *See Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 278, 294 N.W.2d 437 (1980)

("courts have accepted punitive damages as part of Wisconsin tort law"). Ordinarily, tort damages are limited only by the concept of "proximate cause" or certain public policy considerations. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.,* 225 Wis. 2d 305, 316, 592 N.W.2d 201 (1999); *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 575, 335 N.W.2d 834 (1983).

¶ 26. In light of *Micro Data* and the other authority cited, and given that § 134.90 embodies a tort-type action, we determine that "actual loss" as used in § 134.90(4)(a) may include lost profits resulting from Voyager's manufacture and distribution of a defective product incorporating World Wide's trade secret. Thus, the court of appeals correctly concluded that evidence that Voyager marketed defective products incorporating World Wide's trade secret was relevant and admissible to show World Wide's damages under § 134.90(4).

¶ 27. Our interpretation of § 134.90(4)(a) does not result in unlimited consequential damages as Voyager asserts. In order to recover for actual loss under the statute, a plaintiff must prove that its loss was caused by the defendant's violation. Section 134.90(4)(a).

¶ 28. Thus, Voyager cannot be liable for any decline in World Wide's business attributable to Voyager's defective production of World Wide components during the period of their business relationship. Before the dissolution of the business relationship, Voyager was not in violation of § 134.90, and therefore, any loss suffered by World Wide attributable to Voyager's conduct during that period could not have been caused by a violation of § 134.90. In order to recover damages for lost profits, World Wide will have to prove that

Voyager's manufacture and marketing of prosthetic components after the dissolution of their business relationship caused World Wide's losses.

¶ 29. Having determined that "actual loss" as used in § 134.90(4)(a) may include lost profits resulting from Voyager's manufacture and distribution of a defective product incorporating World Wide's trade secret, we turn to Voyager's other assertions that the court of appeals erred in its interpretation of § 134.90. First, Voyager argues that the court of appeals deprived the circuit court of its discretion by declaring World Wide's evidence admissible despite the circuit court's conclusion that any relevance the evidence had was outweighed by its prejudicial effect. Second, Voyager argues that the construction given to § 134.90 by the court of appeals infringes upon preempted fields of federal intellectual property law. We address each argument in turn.

■■■■■

¶ 30. The admissibility of evidence is ordinarily a decision left to the discretion of the circuit court. *State v. Jackson,* 216 Wis. 2d 646, 655, 575 N.W.2d 475 (1998). Even when evidence is otherwise admissible, the circuit court retains the discretion to exclude the evidence if the prejudicial nature of the evidence outweighs its probative value. Wis. Stat. § 904.03; *Lease America Corp. v. Insurance Co. of N. America,* 88 Wis. 2d 395, 399–400, 276 N.W.2d 767 (1979). However, the circuit court erroneously exercises its discretion if it applies an erroneous view of the law. *Sullivan v. Waukesha County,* 218 Wis. 2d 458, 470, 578 N.W.2d 596 (1998).

¶ 31. Here, it is readily apparent from the record that in balancing the probative value of the evidence against its prejudicial nature, the court assumed that the evidence lacked probative value. When the circuit

court declared a mistrial after determining that it had improperly admitted the evidence, the court explained, "it is clear to me now that all of this testimony is irrelevant." In addition, the court stated as follows: "And assuming that it has any probative value. And right now, I think it has virtually none or none—whatever probative value it might have, it seems to me is really substantially outweighed by the danger of unfair prejudice."

¶ 32. Because the court incorrectly assumed that the evidence was not relevant, it could not have properly exercised its discretion when it balanced the probative value of the evidence against any danger of prejudice. Therefore, we agree with the court of appeals that the circuit court erred in preventing World Wide from introducing the evidence. Voyager is incorrect in asserting that the court of appeals' interpretation of § 134.90 improperly deprived the circuit court of its discretion.

¶ 33. Next, we turn to Voyager's assertion that a construction of § 134.90 to allow for the damages World Wide seeks infringes upon the federally preempted field of intellectual property law. According to Voyager, a construction of § 134.90 to permit the damages World Wide seeks conflicts with federal intellectual property law requiring that when an article is unprotected by patent or copyright, state law may not forbid others to copy that article. In support of its argument, Voyager cites three United States Supreme Court cases, *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141 (1989), *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234 (1964), and *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225 (1964). Voyager's analysis of preemption and intellectual property law is, however, incomplete.

¶ 34. *Compco, Sears,* and *Bonito Boats* each address whether states may regulate material in the public domain in the face of federal intellectual property law. For example, in *Compco,* the Court determined that when an article is unprotected by a patent or a copyright, to forbid copying would interfere with the federal policy "allowing free access to copy whatever the federal patent and copyright laws leave in the *public domain.*" 376 U.S. at 237 (emphasis added). Similarly, in *Bonito Boats,* the Court concluded that "[a] state law that substantially interferes with the enjoyment of an unpatented utilitarian or design conception *which has been freely disclosed by its author to the public at large* impermissibly contravenes the ultimate goal of public disclosure and use which is the centerpiece of federal patent policy." 489 U.S. at 156–57 (emphasis added).

¶ 35. A trade secret, by definition, is not in the public domain. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 484 (1974). Rather, a trade secret is something that derives its value "from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Wis. Stat. § 134.90(1)(c).

¶ 36. Voyager fails to cite *Kewanee,* in which the Supreme Court specifically addressed whether state trade secret protection is preempted by operation of the federal patent law. 416 U.S. at 472. The Court concluded that, as a general matter, it is not. *Id.* at 492. As the Prefatory Note to the Uniform Trade Secrets Act explains, under *Kewanee,* "neither the Patent Clause of the United States Constitution nor the federal patent

laws preempt state trade secret protection for patentable or unpatentable information." 14 U.L.A. at 434.[6]

¶ 37. We acknowledge that, at least before *Kewanee* and *Bonito Boats,* some of the language in *Compco* and *Sears* could be construed to substantially curtail state trade secret law. However, *Bonito Boats* underscores that the Court does not endorse Voyager's interpretation of *Compco* and *Sears.* In *Bonito Boats,* the Court explained:

> Read at their highest level of generality, the two decisions [*Compco* and *Sears*] could be taken to stand for the proposition that the States are completely disabled from offering any form of protection to articles or processes which fall within the broad scope of patentable subject matter. .... [T]he broadest reading of *Sears* would prohibit the States from regulating the deceptive simulation of trade dress *or the tortious appropriation of private information.*
>
> That the extrapolation of such a broad preemptive principle from *Sears* is inappropriate is clear from the balance struck in *Sears* itself. ....

489 U.S. at 154 (emphasis added). The Court explained further:

> What was implicit in our decision in *Sears,* we have made explicit in our subsequent decisions concerning

---

[6] Commentators have observed that before *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470 (1974), the relationship between federal intellectual property law and state trade secrets law was highly uncertain. *See, e.g.,* Mark I. Koffsky, *Patent Preemption of Computer Software Contracts Restricting Reverse Engineering: The Last Stand?,* 95 Colum. L. Rev. 1160, 1171 (1995); David A. Rice, *Public Goods, Private Contract and Public Policy: Federal Preemption of Software License Prohibitions Against Reverse Engineering,* 53 U. Pitt. L. Rev. 543, 574–75 (1992).

> the scope of federal pre-emption of state regulation of the subject matter of patent. Thus, in *Kewanee*[], we held that state protection of trade secrets did not operate to frustrate the achievement of the congressional objectives served by the patent laws.

*Id.* at 155.

¶ 38. Voyager's other argument relating to pre-emption seems to be that World Wide cannot recover the damages it seeks under § 134.90 because similar damages may be available in an action for commercial disparagement or confusion of source under the Lanham Act, the federal trademark statute. *See* 15 U.S.C.A. § 1125 (2001). According to Voyager, a construction of § 134.90 to encompass damages that might also be available under the Lanham Act allows plaintiffs to "avoid the limitations and restrictions" of the Lanham Act and to "short circuit the requirements of the Lanham Act."

¶ 39. Even assuming that World Wide could have maintained an action under the Lanham Act, it does not follow that the damages it seeks under § 134.90 are preempted by the Lanham Act. Voyager cites no case law, other than *Compco* and *Bonito Boats,* in support of its assertion that the Lanham Act has this sort of preemptive effect on state trade secrets law. In contrast, our search of the case law reveals that federal courts regularly permit litigants to maintain concurrent causes of action under trade secret law and the Lanham Act. *See, e.g., Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488, 1490 (5th Cir. 1990); *Unix System Labs., Inc. v. Berkeley Software Design, Inc.,* 832 F. Supp. 790, 796–97 (D.N.J. 1993); *CNA Fin. Corp. v. Local 743,* 515 F. Supp. 942, 944 (N.D. Ill. 1981). Thus, we decline to

adopt Voyager's broad and unprecedented interpretation of the preemption doctrine.

## IV

¶ 40. In sum, we determine that "actual loss" in § 134.90(4)(a) includes lost profits allegedly resulting from Voyager's manufacture and distribution of defective products incorporating World Wide's trade secret. We further determine that the court of appeals correctly interpreted § 134.90(4) to conclude that evidence that Voyager marketed defective products incorporating World Wide's trade secret was admissible. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.